UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JAMES J. MCCARTHY,

                         Plaintiff ,           Docket No.  08-CV-01122
                                        (LDW) (ETB)

      -against-


WACHOVIA BANK, N.A., MEL S. HARRIS,
and MEL HARRIS AND ASSOCIATES, LLC.,

                          Defendants.
------------------------------------------------------------x


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT WACHOVIA BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT


IRWIN POPKIN, ESQ.(ip-6851)         LELAND L. GREENE, ESQ.(lg-8074)
1138 William Floyd Parkway          585 Stewart Avenue, Suite 790
Shirley,  New York 11967              Garden City, New York 11530
(631) 281-0030                         (516) 746-3800

                                     *Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**POINT  I**

**MCCARTHY NEVER AUTHORIZED WACHOVIA**
**TO HONOR THE RESTRAINING**
**NOTICE ISSUED BY HARRIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**A.**     **Wachovia's Action in Honoring the Restraining Notice**
           **was Not Proper Under the Deposit Agreement** . . . . . . . . . . . . . . . . . . . . . . . 3

**B.**     **McCarthy Did Not Waive His Due Process Rights**
           **Under the Provisions of the Depositor Agreement**  . . . . . . . . . . . . . . . . . . . . 5

**C.**     **McCarthy Is Not Making a Claim Against Wachovia for**
           **Failure to Notify Him of the Restraining Notice**  . . . . . . . . . . . . . . . . . . . . . 9

**POINT II**

**THE ENFORCEMENT OF SISTER STATES**
**JUDGMENTS WITHOUT "DOMESTICATION"**
**GIVES RISE TO "DUE PROCESS' VIOLATIONS** . . . . . . . . . . . . . . . . . . . . . . . .   10

**POINT III**

**THE "SEPARATE ENTITY RULE"**
**STILL APPLIES IN NEW YORK**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**POINT IV**

**WACHOVIA WAS A STATE ACTOR**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**POINT V**

**FEDERAL LAW DOES NOT**
**PREEMPT MCCARTHY'S CLAIM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**McCarthy Has a Viable**
**Contract Claim Against Wachovia** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

Page

*Alsens Amer. Portland Cement Works v. Degnon Contr. Co.*,
    222 NY 34 (1917) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Baker by Thomas v. General Motors Corp.,* 522 U.S. 222,
    118 S.Ct. 657 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Barnett Bank of Marion County N.A. v. Nelson,* 517 U.S. 25, 33 (1996) . . . . . . . . . . 20, 21

*Beneficial National Bank v. Anderson,* 539 U.S. 1,
    123 S.Ct. 2058, 156 L.Ed.2d 1 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Briarpatch Limited, L.P.  v. Phoenix Pictures, Inc.,* 373 F. 3d 296 (2d Cir. 2004) . . . 21, 22

*CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732,
    123 L.Ed.2d 387 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Doe v. Marsh* 105 F.3d 106 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Erie Telecommunications, Inc. v. City of Erie, Pa.*, 853 F.2d 1084
    (3d Cir., 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983,*
    *32 L.Ed.2d 556 (1972)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Granger v. Harris,* 2007 WL 1213416 (E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . 15

*Holm v. Smilowitz,*  840 P.2d 157, 163 (Utah App.,1992) . . . . . . . . . . . . . . . . . . . . . 12

*Horn v. New York Times*, 100 N.Y.2d 85, 760 N.Y.S.2d 378 (2003) . . . . . . . . . . . . . . . 23

*Huggins v. Pataki,* 2002 WL 1732804, 5 (E.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . 23

*International Shoe Corp. v. Washington,* 326 U.S. 310 (1945) . . . . . . . . . . . . . . . . . . 13

*Jefpaul Garage Corp. v. Presbyterian Hosp. in City of New York,*
    61 N.Y.2d 442, 474 N.Y.S.2d 458 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019,
    82 L.Ed. 1461 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Koehler v. Bank of Bermuda Ltd., (N.Y.)* 12 N.Y.3d 533,
    883 N.Y.S.2d 763(2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10 13

*McElmoyle v. Cohen,*  38 U.S. 312, 10 L.Ed. 177 (1839) . . . . . . . . . . . . . . . . . . . . 12, 13

*Milliken v. Meyer,* 311 U.S. 457, 463 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Milwaukee County v. M. E. White Co.*, 296 U.S. 268, 276,
    56 S.Ct. 229, 233, 80 L.Ed. 220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

iii

*Morris v. New York City Employees' Retirement System,*
    129 F.Supp.2d 599 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Morse v. Mutual Federal Savings & Loan Assn.,* 536 F.Supp 1271 (D. Mass 1982) . . . . 18

*Motorola Credit Corp. v. Uzan,* 288 F.Supp.2d 558 (S.D.N.Y., 2003) . . . . . . . . . . . . . . 14

*National Union Fire Ins. Co. of Pittsburgh, Pa. v. Advanced Employment Concepts, Inc.,*
    269 A.D.2d 101, 703 N.Y.S.2d 3, (1st Dep't 2000) . . . . . . . . . . . . . . . . . . . . . . 14

*Riley v. New York Trust Co.,* 315 U.S. 343, 62 S.Ct. 608 (1942) . . . . . . . . . . . . . . . . . . 13

*Samara Brothers, Inc., v. Wal-Mart Stores,* 165 F.3d 120 (2d Cir. 1998),
    *rev'd on other grounds,* 529 U.S. 205, 120 S.Ct.1339,
    146 L.Ed.2d 182 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Spann v. Crummerford,* 1857 WL 5223, 2 (Tex. 1857) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Strod v. Lewenstark,* 958 So.2d 1138 (Fla.App. 4 Dist. 2007) . . . . . . . . . . . . . . . . . . . . 11

*Tuxedo Beach Club Corp. v. City Federal Savings Bank,*
    749 F.Supp. 635  *(D. N.J. 1990)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Mapp, 476 F.2d 67 (2d Cir.1973)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Morgan,* 51 F.3d 1105, 1110 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 6

*Wachovial Bank, N.A. v. Anoplate Corp.,* Sup. Ct. (Bronx Co. 2004) . . . . . . . . . . . 8, 9

*Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88 (1917) . . . . . . . . . . . . . . . . . . . . . . . . 23

**Authorities**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

12 CFR  § 560 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

General Business Law § 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

CPLR § 5222 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

CPLR § 5018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

CPLR § 5225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CPLR § 5239 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CPLR § 5401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CPLR § 5406 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FRCP 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FRCP 12 (b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

General Business Law Article 22-A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

McKinney's Uniform Dist. Ct. Act § 1505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Uniform Enforcement of Foreign Judgment Act" . . . . . . . . . . . . . . . . . . . . . . . . . . 22

West's F.S.A. § 55.503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

West's F.S.A. 55.509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

West's F.S.A. § 55.505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## PRELIMINARY STATEMENT

Plaintiff, James McCarthy ("McCarthy") respectfully submits this Memorandum of Law in opposition to Defendant Wachovia Bank, N.A. ("Wachovia") motion for summary judgment pursuant to FRCP 56.

McCarthy commenced this action, styled as a class action, against Wachovia, and Mel S. Harris, Esq., a New York attorney that practices law as a partner, member and/or manager of the defendant law firm; and Mel Harris and Associates, LLC, a New York law firm located at 5 Hanover Square, 8th Floor, New York, New York  (collectively referred to as "Harris") on behalf of himself, and all those persons similarly situated, for the damages suffered as a result of Wachovia having improperly restrained his bank account and/or charged a processing fee in connection therewith.

## SUMMARY OF THE ARGUMENT

The Practice of enforcing non-domesticated foreign judgments is contrary to the laws of the states and is contrary to the federal Constitution. Wachovia's creation, for its convenience, of a central clearing center for the submission of restraining orders, does not relieve it from its obligation to act in a manner which is not contrary to the United States Constitution.

## THE FACTS

At the time this action was commenced, McCarthy, resided in Moriches, New York  and his wife Cynthia McCarthy[1] then maintained a winter residence in Venice, Florida . In January 2008, McCarthy and his wife opened a bank account with Wachovia, in Venice, Florida, to serve

---

[1] Cynthia McCarthy is not named as a party plaintiff in this case because it is a class action and she is a member of the class.

their banking needs during the winter months.

In August 2003, Harris commenced an action against McCarthy in the Fourth District Court of Suffolk County, on behalf of NCO Portfolio Management an Assignee of AmEx Corp. Card. McCarthy was served by "nail and mail." At or about the time the action was commenced, McCarthy moved to East Moriches. On January 4, 2004, a default judgment[2] in the sum of $8,794.70 (the "Judgment"[3]) was rendered against McCarthy, in the Fourth District Court of Suffolk County.

On or about January 23, 2008, Harris, served a restraining notice (hereinafter the "Notice" or "Restraining Notice") upon Wachovia in Philadelphia, Pennsylvania. Wachovia, then wrote to McCarthy and furnished him with a copy of the Notice. The letter stated that: "According to state law, Wachovia must comply with this Order and immediately hold/debit all funds in your account(s)"... "This includes a $100.00 processing fee that has been debited from the account(s) referenced above."

### POINT I

### MCCARTHY NEVER AUTHORIZED WACHOVIA
### TO HONOR THE RESTRAINING NOTICE ISSUED BY HARRIS

Initially, Wachovia can not rely upon the so called Deposit Agreement to support its motion for summary judgment. Judge Wexler has determined that : "The presence of **several**

---

[2]New York's version of the "Uniform Enforcement of Foreign Judgment Act" specifically excludes default judgments (NY CPLR § 5401) but requires in such instance the institution of a plenary action (NY CPLR § 5406) in order to domesticate the foreign judgment.

[3]A transcript of the Judgment was never filed with the Suffolk County Clerk pursuant to McKinney's Uniform Dist. Ct. Act § 1505 and New York CPLR § 5018 (a) rendering an execution upon the judgment effective only upon personal property within Suffolk County. (Uniform District Court Act §1505; CPLR 5018(a)).

**issues of fact**, critical to a determination as to whether Plaintiff is bound by the alleged depositor agreement, preclude determination of this likely dispositive issue." *McCarthy v. Wachovia Bank, N.A.,* 2008 WL 5145602, 3 (E.D.N.Y. 2008) Emphasis added.

**A.     Wachovia's Action in Honoring the Restraining Notice
         was Not Proper Under the Deposit Agreement**

Wachovia, points to the fine print of a Customer Access Agreement McCarthy signed when he opened the Venice, Florida account, which incorporates by reference "Wachovia's Deposit Agreement and Disclosures ...**I also agree to pay all fees...in accordance with the fee schedules which will be provided to me by Wachovia**" (emphases added),  as a shield from the consequences of having violated McCarthy's constitutional rights.

Karen L. Mattingly ("Mattingly"), a Financial Specialist (Exhibit 12, M. p. 12)[4] opened the account for Wachovia. At the time the account was opened, Mattingly had the McCarthys execute a document entitled Customer Access Agreement ("CAS") (Exhibit 10) which Mattingly characterized as a signature card. (M. p. 20).  Mattingly asked McCarthy to confirm that the CAS contained his correct Social Security number. He did. She then directed him to sign the CAS, as confirmation of that fact. There were no further discussions regarding the contents of the document (M. p. 21).[5]

---

[4]"M" references the transcript of Mattingly's deposition testimony submitted in connection with McCarthy's motion for summary judgment (Exhibit 10)

[5] The CAS contained the following language (Exhibit 8):

Acceptance of Terms and Conditions:

I agree to be bound by the terms and conditions including, but not limited to Wachovia's Deposit Agreement and Disclosures,  applicable to each product or service which I obtain from Wachovia now or in the future, which terms and conditions will be provided to me.  I also agree to pay all fees associated with such  products, accounts and services in accordance with the fee schedules which will be provided to me by Wachovia.

Mattingly never read the CAS, nor was she aware of its contents nor "fine print." Mattingly did not discuss the CAS or its "fine print, " nor its implications with other bank employees (M. p. 22-23).

Mattingly delivered a "Deposit Agreement and Disclosure" to McCarthy **in a closed** packet at the time the account was opened (Exhibit 11). Paragraph 27 of that document was entitled "Legal Process Affecting Accounts."[6] Mattingly did not discuss anything about legal process affecting accounts with McCarthy at the time the account was opened (M. p. 28).

Significantly, when Mattingly was trained as and promoted to a "Financial Specialist, "the person at the branch who opens accounts, she was not been instructed to discuss matters relating to legal process with customers when opening accounts." (*id*).

Mattingly was also not familiar with paragraph 29 of the "Deposit Agreement and Disclosure" entitled "Costs and Attorneys Fees."[7]  That also was not something that was discussed with the McCarthy's at the time the subject bank account was opened.

When Mattingly was asked:

> "Is there anything during the course of your training – at any time were you advised that the customer should be apprised of both–the matters contained in the paragraph described as "Legal process

_____

[6]  ¶ 27 of the Deposit Agreement and Disclosure provides:  **Legal Process Affecting Accounts**. If legal action such as an attachment, garnishment, levy or other state or federal legal process ("legal process") is brought against your account... you hereby authorize us to accept and comply with it, no matter how it was received by us. You hereby direct us not to contest on your behalf any such document or legal process... You agree that because we have financial centers or offices in numerous jurisdictions and states other than where your account was opened, if we are served with any process or receive any document as referenced above in or from any jurisdiction or state, you hereby direct us to recognize and honor such service of process.

[7]  **29. Costs and Attorney's Fees.** You agree to reimburse us for our-costs and expenses (including attorney's fees) incurred in any action that we bring against you concerning your account and in any lawsuit instituted by you against us where we are the prevailing party. You further agree to reimburse us for any actual expenses we incur to execute, cancel or amend any wire transfer payment order, or perform any related act at your request, including, without limitation, costs associated with investigations and research we initiate internally. We may charge any account of yours for such costs and expenses without prior notice to you.

affecting accounts" or the paragraph entitled "Costs and attorney's fees" with the client when an account is opened."

The response was: "**I've never been trained to talk to somebody about that.**" (M. p. 29-30).

When asked about the provision in the CAS referencing "Acceptance of terms and conditions" Mattingly stated: **" I've never read the document. I've never gone over the whole document. So I would have to say no. I just go and say, That's your social, if that's correct."** (M. p. 31) (Emphasis supplied).

At her deposition, Mattingly was also asked the following questions and gave the following answers:

Q.      Just so that I have it crystal clear in my mind, you have never been trained nor did you see in any training manuals, any requirement at the time an account is opened to discuss with a customer, the contents of the deposit agreement and disclosures relating to legal process affecting accounts?

A.      I don't go through any of those things, no.

Q.      And the costs and attorney's fees.

A.      I don't go through any of those, no. (M. p. 36-37)

**B.      McCarthy Did Not Waive His Due Process Rights Under the Provisions of the Depositor Agreement**

Nothing in either Mattingly's deposition testimony, nor McCarthy's deposition testimony (Exhibit 16 to McCarthy's motion for summary judgment) lends support to the conclusion that McCarthy waived his due process rights or had any inclination that the documents delivered to him in a packet contained Paragraph 27 of the deposit agreement which allows Wachovia, in the

event they "...are served with any process or receive any document as referenced above in or from any jurisdiction or state, you hereby direct us to recognize and honor such service of process."

A waiver is defined as "an intentional relinquishment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). "A waiver is the voluntary abandonment or relinquishment of a known right which is essentially a matter of a of intent which must be proved. *Jefpaul Garage Corp. v. Presbyterian Hosp. in City of New York*, 61 N.Y.2d 442, 446, 474 N.Y.S.2d 458 (1984); *Alsens Amer. Portland Cement Works v. Degnon Contr. Co.,*222 NY 34, 37(1917). "A waiver of a constitutional right must be voluntary, knowing and intelligent, that is, the act of waiver must be shown to have been done with awareness of its consequences." *United States v. Morgan,* 51 F.3d 1105, 1110 (2d Cir.1995). "Waiver of a constitutionally protected interest and 'acquiescence in the loss of fundamental rights' cannot be presumed, *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), nor may it be lightly inferred." *U. S. v. Mapp,* 476 F.2d 67, 77 (2d Cir.1973). The Court must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst, supra,* 304 U.S. at 464. See also, *Doe v. Marsh* 105 F.3d 106 (2d Cir. 1997)

In *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the plaintiff had purchased household goods under a conditional sales contract. When the plaintiff defaulted, the seller obtained a writ of replevin ordering a sheriff to seize the goods. Fuentes challenged the pre-judgment replevin procedures, arguing that they violated due process because they did not provide notice or an opportunity to be heard before the property was seized. The seller argued that the plaintiff had waived her right to notice and a hearing by signing a contract that provided that, "in

the event of default of any payment or payments, Seller at its option may take back the merchandise." *Fuentes,* 407 U.S. at 94.

While clearly there are distinctions between pre-judgment seizures and post-judgment restraints on bank accounts, the underlying issues surrounding a purported waiver remain the same. In reaching its conclusion that Ms. Fuentes had not waived her due process rights by signing the contract, the Supreme Court observed circumstances substantially similar to those presented by this case, that "[t]here was no bargaining power over contractual terms between the parties who, in any event, were far from equal in bargaining power," "[t]he purported waiver provision was a printed part of a form sales contract and a necessary condition of the sale," and the seller "made no showing whatever that the appellants were actually aware or made aware of the significance" of the waiver provision. *Id.* at 95.

In *Morris v. New York City Employees' Retirement System,* 129 F.Supp.2d 599 (S.D.N.Y. 2001), the Court observed:

> In the civil context, a party waiving constitutionally protected rights--even when doing so through the execution of a contract--must also be made aware of the significance of the waiver. For example, in Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the plaintiff had purchased household goods under a conditional sales contract. When the plaintiff defaulted, Firestone obtained a writ of replevin ordering a sheriff to seize the goods. Fuentes challenged the replevin procedures, arguing that they violated due process because they did not provide notice or an opportunity to be heard before the property was seized. Firestone argued that the plaintiff had waived her right to notice and a hearing by signing a contract that provided that, "in the event of default of any payment or payments, Seller at its option may take back the merchandise."Fuentes, 407 U.S. at 94, 92 S.Ct. 1983. In reaching the conclusion that Fuentes had not waived her due process rights by signing the contract, the Court observed that "[t]here was no bargaining power over contractual terms between the parties who, in any event, were far from equal in bargaining power," "[t]he

-7-

> purported waiver provision was a printed part of a form sales
> contract and a necessary condition of the sale," and Firestone "made
> no showing whatever that the appellants were actually aware or
> made aware of the significance" of the waiver provision. Id. at 95,
> 92 S.Ct. 1983.
>
> In contrast, in D.H. Overmyer v. Frick Co., 405 U.S. 174, 92 S.Ct.
> 775, 31 L.Ed.2d 124 (1972), which was decided earlier that same
> year, the Court found a valid contractual waiver of due process
> rights where the contract "was negotiated between two
> corporations," "the waiver provision was specifically bargained for
> and drafted by their lawyers in the process of these negotiations,"
> and "both parties were 'aware of the significance' of the waiver
> provision." Fuentes, 407 U.S. at 95, 92 S.Ct. 1983 (quoting
> Overmyer, 405 U.S. at 187, 92 S.Ct. 775).

Morris, 129 F.Supp. at 609.

In *Erie Telecommunications, Inc. v. City of Erie, Pa.*, 853 F.2d 1084 (3d Cir., 1988), the

Court observed:

> The contract in *Overmyer* was negotiated between two corporations;
> the waiver provision was specifically bargained for and drafted by
> their lawyers in the process of these negotiations. As the Court
> noted, it was "not a case of unequal bargaining power or
> overreaching. The Overmyer-Frick agreement, from the start, was
> not a contract of adhesion." *Id.* at 186 [92 S.Ct. at 783]. Both parties
> were "aware of the significance" of the waiver provision. *Ibid.*

*Erie Telecommunications, Inc.*, 853 F.2d at 1096.

Wachovia's cite to the unreported decision of *Wachovia Bank National Association v.*

*Anoplate Corporation, et., al.*, Sup. Ct. Bronx Co. (2004), fails to support its apparent contention

that a New York restraining notice has extra territorial application. *Anoplate*, did not involve a

restraining notice, but was rather a proceeding pursuant to CPLR § 5239 to determine adverse

claims. In that proceeding, which sought to enforce a New York Judgment against a Connecticut

bank account, all of the parties, including the bank Wachovia, the debtor and a third party were

before the Court. While *Anoplate*, can be reconciled with *Koehler v. Bank of Bermuda Ltd.,* *(N.Y.)* 12 N.Y.3d 533,  883 N.Y.S.2d 763, 767 (2009), since all of the necessary parties were parties to the proceeding before disposition of the debtor's property was determined, such was not the case in the present circumstances.

*Koehler* expressly acknowledged that "[T]he key to the reach of the turnover order is personal jurisdiction over a particular defendant." *Koehler* does not apply to the circumstances presented here.

**C.    McCarthy Is Not Making a Claim Against Wachovia for Failure to Notify Him of the Restraining Notice.**

Plaintiff is not seeking redress because Wachovia failed to notify him of the receipt of or the implementation of the Restraint on his account as a consequence of the Restraining Notice. Rather, the predicate for liability is its giving extraterritorial effect to a judgment rendered in the Suffolk County District Court.  The District Court judgment is only effective as against personal property located in Suffolk County.  Wachovia and its central processing office in Philadelphia, Pennsylvania because more than ninety-five percent of the restraints they process come from New York (See, Shannon deposition submitted in support of McCarthy's summary judgment motion, pp. 46-47) knew or should have known that the Suffolk County District Court Judgment could not, without docketing in the Supreme County Clerk's Office be used to restrain funds outside Suffolk County.  It could not be used to restrain personal property located in Nassau County or elsewhere in the state of New York. With that as a backdrop, it is hard to explain how that same judgment could be used to restrain personal property located outside the state of New York.

## POINT II

### THE ENFORCEMENT OF SISTER STATES
### JUDGMENTS WITHOUT "DOMESTICATION"
### GIVES RISE TO "DUE PROCESS' VIOLATIONS

Whether or not a New York Court has the power under *Koehler*, to order a bank to restrain property located outside of New York is not relevant to the adjudication of his claims. No judicial proceeding in which Wachovia was made a party was brought to require Wachovia to turn over the moneys contained in McCarthy's Florida bank account in the Suffolk County Fourth District Court, or in any other New York court. No New York court acquired jurisdiction over Wachovia. Furthermore, *Koehler* concerned a proceeding that mandates that the judgment debtor be made a party.[8]

The purpose of having to domesticate a foreign judgment is to ensure that the judgment debtor receives notice that another person or entity is seeking to enforce a judgment against him in a state other than the one in which the judgment was rendered. The judgment debtor is thus afforded an opportunity to assert any jurisdictional objections he may have to the enforcement of such judgment in the sister state.

Notice to the judgment debtor of an attempt to restrain his property is implicit in *Koehler, supra. Koehler* expressly acknowledged that "[T]he key to the reach of the turnover order is personal jurisdiction over a particular defendant." *Koehler* does not apply to the circumstances presented here. *Koehler* relates to the application of a **turn over order** pursuant to a special proceeding commenced pursuant to CPLR § 5225(b), which mandates that a judgment debtor be

---

[8]   A turn over proceeding under  CPLR § 5225(b), as does a proceeding under the Uniform Domestication of Foreign Judgments Act, obviates the deprivation of the constitutional rights described in the complaint, since the judgment debtor is a necessary party.

made a party to that proceeding.  The statute clearly and unequivocally provides: "Notice of the proceeding shall also be served upon the judgment debtor." The required notice passes constitutional muster because it allows the judgment debtor collaterally to attack the underlying judgment on jurisdictional grounds. In contra-distinction, no such opportunity collaterally to attack the predicate judgment prior to freezing his bank account was given to McCarthy.

To deprive the judgment debtor of the opportunity to raise jurisdictional objections to the enforcement of a "foreign judgment" in a sister state and permit the enforcement of such judgment without having gone through the "domestication" process, as happened in this case, results in the deprivation of the judgment debtors property located in the sister state without the necessary notice and opportunity to be heard which due process of law mandates. This forms the basis for a Section 1983 claim "Enforcement measures do not travel with the sister state judgment as preclusive effects do; such measures remain subject to the evenhanded control of forum law." *Baker by Thomas v. General Motors Corp.,* 522 U.S. 222, 235 , 118 S.Ct. 657, 665 (1998).

In *Strod v. Lewenstark,* 958 So.2d 1138 (Fla.App. 4 Dist. 2007) the Florida Court held that the judgment debtor's due process rights were violated when he did not receive notice of the proceedings to domesticate the foreign judgment.[9]

---

[9]West's F.S.A. § 55.503. Recording and status of foreign judgments; fees

(1) A copy of any foreign judgment certified in accordance with the laws of the United States or of this state may be recorded in the office of the clerk of the circuit court of any county...

West's F.S.A. § 55.505. Notice of recording; prerequisite to enforcement:

(2) Promptly upon the recording of the foreign judgment and the affidavit, **the clerk shall mail notice of the recording of the foreign judgment, by registered mail with return receipt requested, to the judgment debtor** at the address given in the affidavit and shall make a note of the mailing in the docket... (Emphasis supplied).

West's F.S.A. 55.509. Stay of enforcement of foreign judgment

(1) If, within 30 days after the date the foreign judgment is recorded, the judgment debtor files an action

> Although it is clear that under the United States Constitution, another state's orders are entitled to full faith and credit in Utah, *see* U.S. Const. art. IV, § 1, it is equally clear that a foreign judgment must first be filed in Utah in order for it to become an enforceable Utah order, and furthermore, that the parties are, in most circumstances, entitled to a hearing on the foreign order to examine the narrow issue of whether the other state court had jurisdiction when it rendered its order. Neither occurred here, resulting in denial of Holm's substantive due process rights.

*Holm v. Smilowitz,* 840 P.2d 157, 163 (Utah App.,1992).

To guard against such due process violations, Full Faith and Credit to the enforcement of foreign judgments is given **only** upon compliance with the "Uniform Enforcement of Foreign Judgment Act" ("UEFJA "), or the domestication of the foreign judgment by means of a plenary action. "A domestic judgment may be enforced by an execution issued thereon within our state; whereas no execution can issue in our state upon judgments rendered in another." *Spann v. Crummerford,* 1857 WL 5223, 2 (Tex. 1857).

The law in respect to the domestication of foreign judgments has not changed in 170 years. Thus, in *McElmoyle v. Cohen,* 38 U.S. 312, 10 L.Ed. 177 (1839), the Supreme Court held that a South Carolina judgment could not be directly enforced by execution in Georgia. The Court explained that "to give it the force of a judgment in another State, it must be made a judgment there, and can only be executed in the latter as its laws may permit. It must be conceded that the judgment of a State court cannot be enforced out of the State by an execution issued within it." *Id.*

---

contesting the jurisdiction of the court which entered the foreign judgment or the validity of the foreign judgment ...the court shall stay enforcement of the foreign judgment and the judgment lien upon the filing of the action by the judgment debtor...

at p. 325. "The Constitution does not require, *McElmoyle v. Cohen*, 13 Pet. 312, 328, 10 L.Ed. 177; *Milwaukee County v. M. E. White Co.*, 296 U.S. 268, 276, 56 S.Ct. 229, 233, 80 L.Ed. 220, nor does Delaware provide that the judgments of Georgia have the force of those of her own courts. A suit in Delaware must precede any local remedy on the Georgia judgment." *Riley v. New York Trust Co.*, 315 U.S. 343, 349, 62 S.Ct. 608, 612 (1942).

This is a variation of the theme voiced by the dissent in *Koehler v. Bank of Bermuda, Limited, supra,* 12 N.Y.3d 533, 544  where the dissent was deeply concerned with the "traditional notions of fair play and substantial justice" as set forth in *International Shoe Corp. v. Washington*, 326 U.S. 310, 316 (1945) quoting  *Milliken v. Meyer*, 311 U.S. 457, 463 (1940). The answer is that in a "turn over proceeding" the judgment debtor is given notice of the proceeding and has an opportunity collaterally to attack the underlying judgment. It is the personal jurisdictional over the judgment debtor acquired in the turn over proceeding  prerequisite that supports a court directing a judgment debtor to bring his personal property located in another state into New York for execution.[10]

## POINT III

### THE "SEPARATE ENTITY RULE"
### STILL APPLIES IN NEW YORK

The "separate entity" rule  has been modified in New York only to the extent of allowing for service on the main branch  of a bank within the state of New York..

In *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Advanced Employment Concepts,*

---

[10]Furthermore, Wachovia mistakenly construes New York to law to allow it to blindly act, in any situation, upon any restraining notice and be relieved from any consequences resulting from such action. New York law is not that permissive. It allows broad application only where the judgment was obtained in the same county as the bank branch where the funds subject to the restraint are located.

*Inc.*, 269 A.D.2d 101, 703 N.Y.S.2d 3, (1st Dep't, 2000) the Supreme Court had vacated a

restraining order and order of attachment issued against two bank accounts maintained in the State

of Florida. The Appellate Division affirming the order stated:

> The holding of *Digitrex,* however, was clarified, and limited, by
> *Limonium Maritime, S.A. v. Mizushima Marinera, S.A.,* 961
> F.Supp. 600, in which the court held that the exception to the
> separate entity rule is applicable only where the restraining notice
> is served on the bank's main office; the main office and the
> branches where the accounts in question are maintained *are within
> the same jurisdiction;* and the bank branches are connected to the
> main office by high-speed computers and are under its centralized
> control ( *id.* at 607-608).
>
> In this matter, it is clear that the accounts which the petitioner
> seeks to attach are not in the same jurisdiction as the New York
> office that petitioner served. To the extent that the petitioner
> requests that we extend the holdings of *Digitrex* and *Limonium
> Maritime, S.A.* to encompass all of a bank's branches,
> notwithstanding their physical location outside of this jurisdiction,
> we decline to do so and note that such an extension would require,
> in our view, a pronouncement from the Court of Appeals or an act
> of the Legislature.

*National Union Fire Ins. Co. of Pittsburgh, Pa. ,.* 269 A.D.2d at 101, 703 N.Y.S.2d at 4. See,

also, *Motorola Credit Corp. v. Uzan,* 288 F.Supp.2d 558 (S.D.N.Y., 2003)


## POINT IV

## WACHOVIA WAS A STATE ACTOR

Paragraph 34 of the Second Amended Complaint states:

> "Wachovia acted  under the compulsion of the provisions
> contained in NY CPLR § 5222(b), when by its by its own
> admission, it advise/d McCarthy that  "According to state law,
> Wachovia must comply with this Order...." By freezing
> McCarthy's bank account in Florida under the compulsion of the
> admonishment contained in the Notice issued by Harris, Wachovia

-14-

became a state actor acting "under color of state law."

Judge Sifton in *Mayers v. New York Community Bancorp, Inc.,* 2005 WL 2105810, 9-10

(E.D.N.Y. 2005) determined that:

> In order to satisfy the "state compulsion" test, a plaintiff must show that the state "has exercised coercive power or provided such significant encouragement, overt or covert, that the choice in law must be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); see also Okunieff v. Rosenberg, 996 F.Supp. 343, 348-49 (S.D.N.Y.1998), aff'd 166 F.3d 507 (2d Cir.1999). In this case, plaintiffs allege that under NYCPRL § 5222, bank defendants were compelled to freeze accounts, irrespective of their contents, when served with restraint notices or risk being found in "contempt of court." (Second Amended Compl. ¶ 7; N.Y.CPLR § 5222(a)). Because the state statute does not leave the decision of whether or not to freeze an account to the bank's discretion, but instead compels certain action by threatening contempt, the choice "must be deemed that of the state." Blum, 457 U.S. at 1004; compare Okunieff, 996 F.Supp. at 349 (finding no state compulsion where the statute's terms were permissive rather than mandatory and left much discretion to the private actor).

> * * *

> Here, plaintiffs allege facts similar to those alleged in Albert, namely, that defendant banks believed N.Y.CPLR § 5222(a) required them to restrain accounts, irrespective of their contents, when served with restraining notices. Accordingly, I find that the facts alleged by the plaintiffs satisfy Section 1983's "color of state law" requirement.

*Mayers v. New York Community Bancorp, Inc.,* 2005 WL 2105810, 9-10  (E.D.N.Y. 2005). See

also, Judge Feuerstein comments in *Granger v. Harris*, 2007 WL 1213416 (E.D.N.Y. 2007).

-15-

## POINT V

## FEDERAL LAW DOES NOT
## PREEMPT MCCARTHY'S CLAIM

Interestingly, although McCarthy's primary claim is a 42 U.S.C. § 1983 violation,

Wachovia makes the broad assertion that McCarthy's claims are preempted by Federal Law.

McCarthy's only claim where such an assertion has any relevance would be McCarthy's claim

under the New York consumer protection statute. Analysis of the relevant statutes, cases and

authorities, demonstrates that Wachovia  misapprehends the fundamental rules governing

preemption.

New York's Article 22-A of the General Business Law ("GBL") entitled "Consumer

Protection from Deceptive Acts and Practices" (Unfair and Deceptive Acts and Practices –

"UDAP"–Law) concerns the regulation of the ethical practices of all businesses engaged in

commerce in New York. Nothing contained in that law is specifically aimed or directed at any

state objective in conflict with the safe and sound regulation of National Banks.[11] An analysis

_____

[11] 12 C.F.R. Sec. 7.4002 National bank charges. 2(d) states:  State law. The OCC applies
preemption principles derived from the United States Constitution, as interpreted through judicial
precedent, when determining whether State laws apply that purport to limit or prohibit charges
and fees described in this section.

Additionally, 12 C.F.R. Sec. 7.4009 provides:
(2) State laws on the following subjects are not inconsistent with the powers of national banks
and apply to national banks to the extent that they only incidentally affect the exercise of national
bank powers:
(i) Contracts;
(ii) Torts;
(iii) Criminal law
(iv) Rights to collect debts;
(v) Acquisition and transfer of property;
(vi) Taxation;
(vii) Zoning; and
(viii) Any other law the effect of which the OCC determines to be incidental to the exercise of

made by the Office of Thrift Supervision ("OTS" the counterpart of the Office of the Controller of

the Currency) is instructive.  An OTS opinion letter, dated December 24, 1996

(http://www.ots.treas.gov/docs/5/56615.pdf )[12]  address whether three specific Indiana statutes

would be preempted pursuant to 12 CFR 560.2[c], including Indiana's Deceptive Acts and

Practices ("DAP") Statute. That statute, like New York's GBL § 349 (UDAP statute), is designed

to eliminate unfair and deceptive acts and practices in commerce aimed at consumers. The OTS

determined that:

> The DAP statute prohibits specified acts and representations in all consumer transactions without regard to whether the transaction involves an extension of credit.  Although not directly aimed at lenders, this law affects lending to the extent that it prohibits misleading statements and practices in loan transactions by a federal savings association.  Accordingly, under the analysis described above, a presumption arises that the DAP statute would be preempted in connection with loans made by the Association.

> **The OTS has indicated, however, that it does not intend to preempt state laws that establish the basic norms that undergrid commercial transactions**.  Accordingly, in § 560.2(c), the OTS has identified certain categories of state law that are not preempted.

> * * *

> The Indiana DAP falls within the category of traditional  "contract and commercial" law under § 560.2(c)(1).  While the DAP may affect lending relationships, the impact on lending appears to be only incidental to the primary purpose of the statute - - the regulation of the ethical practices of all businesses engaged in commerce in Indiana. There was no indication that the law is aimed at any state objective in conflict with the safe and sound regulation

---

national bank powers or otherwise consistent with the powers set out in paragraph (a) of this section.

[12]Appended hereto

of federal savings associations ... or any other federal objective identified in § 560.2(a). In fact, because federal thrifts are presumed to interact with their borrowers in a truthful manner, Indiana's general prohibition on deception should have no measurable impact on their lending operations. Accordingly, we conclude that the Indiana DAP is not preempted by federal law.

* * *

### Nothing in Federal Law Preempts General Deceptive Practice Statutes

Thus, general principles of federal preemption govern, As indicated above, nothing in federal law preempts general deceptive practice statutes. (Emphasis added).

Office of Thrift Supervision opinion letter dated December 24, 1996, typescript at pages 9-10

The December 24, 1996 OTS letter referenced *Morse v. Mutual Federal Savings & Loan Ass'n of Whitman,* 536 F. Supp 1271 (D. Mass. 1982). In *Morse,* plaintiffs sued a federal savings and loan association to recover on both federal and state claims. The allegations were based substantially upon a Massachusetts statute proscribing unfair and deceptive practices in connection with the freezing of the parties' joint checking account in connection with an unpaid note.  In refusing to discharge an existing mortgage except upon the payment of more than was due; and in attempting to improperly foreclosure a mortgage. The *Morse* Court held:

There is no presumption when, as here, state law has its effect in an area which was "a merely peripheral concern of the (federal regulation)," [citations omitted]. Rather, defendant should have an affirmative burden to show inconsistency, or at least a possibility of conflict. A review of the regulations, 12 C.F.R. §§ 500.1-556, shows no such, either in the area of proscribed unfair or deceptive practices generally, or as to such traditionally state-regulated banking matters as set-offs, debt collection and foreclosures.

*Morse,* 536 F.Supp. at 1280-1281.

-18-

The *Morse* Court held that the Home Owners Loan Act ("HOLA") and various regulations promulgated thereunder by Home Loan Bank Board did not preempt the Massachusetts statute proscribing unfair and deceptive trade practices. The *Morse* Court further observed:

> Although they are instruments of the federal government, the associations are privately owned corporations, aiming to make a profit.  As such, they should comply with the business usages and ethics required of others engaged in similar businesses within the state unless such usages and ethics actually conflict or interfere with federal purposes or unless Congress or the federal regulatory body unmistakably indicates otherwise.

*Morse,*  536 F. Supp at 1280.

In *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), the Supreme Court explained preemption:

> Where a state statute conflicts with, or frustrates, federal law, the former must give way.  U.S. Const., Art. VI, cl. 2; *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981).  In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption.  Thus, pre-emption will not lie unless it is "the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).  Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue.  *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2898, 77 L.Ed.2d 490 (1983).  If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.

*CSX Transportation*, 507 U.S. at 663-664.

Thus, for example, a state statute that specifically prohibited national banks from using the word "savings" in their advertising was preempted because it is aimed or directed at Banks and Banking practices. *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954),

-19-

cited in *Barnett Bank of Marion County N.A. v. Nelson,* 517 U.S. 25, 33 (1996).  The federal law

authorizing national banks must be read to authorize them to engage in the ordinary incidents of

that business, such as advertising. To be preempted there must be a "clear conflict" between  a

state law and the federal laws.

In *Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.,*  471 U.S. 707, 105

S. Ct. 2371, 85 L.Ed2d 714 (1985), the Supreme Court noted:

> We are even more reluctant to infer pre-emption from the
> comprehensiveness of regulations than from the comprehensiveness
> of statutes. As a result of their specialized functions, agencies
> normally deal with problems in far more detail than does Congress.
> To infer preemption whenever an agency deals with a problem
> comprehensively is virtually tantamount to saying that whenever a
> federal agency decides to step into a field, its regulations will be
> exclusive. Such a rule, of course, would be inconsistent with the
> federal-state balance embodied in our Supremacy Clause.

*Hillsborough,*  471 U.S. at 717.

In *Barnett Bank of Marion County N.A. v. Nelson,* 517 U.S. 25, 116 S.Ct. 1103, 134

L.Ed.2d 237 (1996), the Supreme Court recognized that not every state law that affects  national

bank activity "stands as an obstacle" to the accomplishment of the federal purpose:

> In defining the pre-emptive scope of statutes and regulations
> granting a power  national banks, these cases take the view that
> normally Congress would not want States to forbid, or impair
> significantly, the exercise of a power that Congress explicitly
> granted.  To say this is not to deprive States of the power to regulate
> national banks, where (unlike here) doing so does not prevent or
> significantly interfere with the national bank's exercise of its
> powers. See, *e.g.*, *Anderson Nat. Bank* v. *Luckett*, 321 U.S. 233,
> 247-252 (1944) (state statute administering abandoned deposit
> accounts did not "unlawful[ly] encroac[h] on the rights and
> privileges of national banks"); *McClellan* v. *Chipman*, 164 U.S.
> 347, 358 (1896) (application to national banks of state statute
> forbidding certain real estate transfers by insolvent transferees
> would not "destro[y] or hampe[r]" national bank functions);

-20-

> *National Bank* v. *Commonwealth*, 9 Wall. 353, 362 (1870) (national
> banks subject to state law that does not "interfere with, or impair
> [national banks'] efficiency in performing the functions by which
> they are designed to serve [the Federal] Government").

*Barnett Bank,* 517 U.S. at 33-34.

The *Barnett* standards represent an application of the analysis used by the Supreme Court

to determine, in the banking and lending context, whether federal law conflicts with state law to

the extent that the state law is preempted. The focus is on whether a state law precludes the

accomplishment and execution of the full purposes and objectives of Congress.

In *Tuxedo Beach Club Corp. v. City Federal Savings Bank*, 749 F.Supp. 635  (D. N.J.

1990), a lender liability action based upon defendant's alleged agreement  to fund acquisition,

construction and completion of a project, plaintiff sued in state court under various state law

causes of action including violation of New Jersey's consumer fraud statute. The case was

thereafter removed to federal court. On the defendant's motion to dismiss,  the federal court held

that the consumer fraud statute would not be dismissed noting:

> Although Congress provided for strict requirements which must be
> satisfied in order to enforce agreements against federally-insured
> banks, it would in fact be *contrary* to Congressional intent to
> provide such banks with sweeping immunity from claims arising
> out of fraudulent practices.   Notably, other states have applied their
> consumer fraud statutes against banks and savings institutions, and
> federal courts have considered similar state law claims in the face of
> the federal regulatory scheme.

*Tuxedo Beach Club*, 749 F.Supp. at 635 (citations omitted, emphasis in original).

The Second Circuit's decision in *Briarpatch Limited, L.P.  v. Phoenix Pictures, Inc.*, 373

F. 3d 296 (2d Cir. 2004) began with an analysis of *Beneficial National Bank v. Anderson,* 539

U.S. 1, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003), which concerns banking issues in the context of the

National Bank Act. The *Briarpatch* Court makes it clear that the application of its federal

preemption analysis is applicable to the circumstances of this case and dispels the conclusion that

the analysis performed by the *Briarpatch* Court was case and subject matter (copyright) specific.

*Briarpatch* held that complete preemption requires the satisfaction of two criteria:

> Given the Supreme Court's approach in *Anderson,*
> we conclude that it means to extend the complete
> preemption doctrine to any federal statute that both
> preempts state law and substitutes a federal remedy
> for that law, thereby creating an exclusive federal
> cause of action.

*Briarpatch,* 373 F. 3d at 305.

*Briarpatch* instructs that in order for there to be "complete preemption" the state law claim

must pertain to the same "subject matter" and "general scope " of the federal statute. The state law

claim must also not  "...include any extra elements that make it qualitatively different...To

determine whether a  claim  is qualitatively different,  we look at 'what [the] plaintiff seeks to

protect, the theories in which the matter is thought to be protected and the rights sought to be en-

forced.'" *Id.*

*Briarpatch* determined that a finding of "breach of fiduciary duty" added an extra element

that made the plaintiff's claims in that case with respect to conspiracy and aiding and abetting

"qualitatively different" from a pure claim of copyright infringement.

"Intentional deception" was the "extra  element" in *Samara Brothers, Inc., v. Wal-Mart*

*Stores*, 165 F.3d 120 (2d Cir. 1998),  *rev'd  on  other  grounds,* 529 U.S. 205, 120 S.Ct.1339, 146

L.Ed.2d 182 (2000), which sustained  a GBL § 349 claim against a federal preemption attack. The

*Samara* Court held:

> General Business Law § 349 is a consumer protection statute which

> prohibits deceptive acts or practices in the conduct of business. *See,*
> *Teller v. Bill Hayes Ltd.,* 213 A.D.2d 141, 630 N.Y.S.2d 769, 772-
> 73 (2d Dep't 1995). When rejecting Wal-Mart's preemption claim,
> the district court found the extra element under § 349 to be a finding
> of "intentional deception" of consumers.

*Samara Brothers*, 165 F.3d at 131.

While states cannot dictate how federal banks choose to operate, states can insist that

federal savings banks operate in a manner which is free from fraud, deception and coercive

business practices. *See, Gibson v. World Savings and Loan Association*, 103 Cal.App.4th 1291,

128 Cal. Rptr.2d 19 (2002).

**McCarthy Has a Viable**
**Contract Claim Against Wachovia**

Under New York law there is an implied obligation of good faith and fair dealing in all

contracts.  Judge Cardozo explained the concept:

> The law has outgrown its primitive stage of formalism when the
> precise word was the sovereign talisman, and every slip was fatal. It
> takes a broader view today. A promise may be lacking, and yet the
> whole writing may be instinct with an obligation[.]

*Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 (1917, Cardozo, J.) (citations and internal

quotation omitted).  *See also Horn v. New York Times*, 100 N.Y.2d 85, 760 N.Y.S.2d 378 (2003)

("New York recognizes an implied and enforceable obligation of good faith and fair dealing on

the part of a party to a contract in appropriate circumstances....").

Because Wachovia unlawfully seized and/or restrained McCarthy's money, it can not

charge McCarthy a fee for such and unlawful seizure even if its fee schedule so provides, whether

or not the fee schedule was shared with him.

Wachovia's reliance upon *Huggins v. Pataki*, 2002 WL 1732804, 5 (E.D.N.Y. 2002) to

justify the imposition of the $100.00 for processing the restraining notice is also misplaced. The Court's allowance of the fee was predicated upon a finding "...that HSBC did not violate Huggins's rights in complying with the state law requirements of the garnishment procedure...." Wachovia's argument that it may take funds from a depositor's account pursuant to a lawful purpose should be rejected.  The $100.00 was not taken for a lawful purpose. Moreover, taken to its logical conclusion, it would allow a bank to withdraw funds from a depositor's account for any reason or no reason.  This is further complicated where, as here, at least a portion of the funds are exempt from attachment. To allow the withdrawal of funds from a depositor's account, the withdrawal must be lawful and proper in addition to being pursuant to notice.

## CONCLUSION

For the reasons stated, Wachovia's Motion for Summary Judgment should be denied in all respects and McCarthy should be awarded summary judgment on his separate motions for Summary Judgment as against each of the defendants.

Dated: Melville and Garden City, New York
         July 12, 2010

 Respectfully submitted,

*s/ Irwin Popkin*

_____
IRWIN POPKIN, ESQ.(ip-6851)
1138 William Floyd Parkway
Shirley,  New York 11967
(631) 281-0030

LELAND L. GREENE, ESQ.(lg-8074)
585 Stewart Avenue, Suite 790
Garden City, New York 11530
(516) 746-3800

***Attorneys for Plaintiff***

# A P P E N D I X



**Office of Thrift Supervision**
Department of the Treasury

1700 G Street, N.W., Washington, D.C. 20552 • (202) 906-6251

Chief Couns

December 24, 1996



**Re:   Preemption of State Laws Applicable to
Credit Card Transactions**

Dear ▉▉▉▉▉▉

    This responds to your inquiry, submitted on behalf of ▉▉▉▉▉▉▉ (the "Association"), to the Office of Thrift Supervision ("OTS") regarding the application of three specific Indiana laws to the Association's proposed ▉▉▉ credit card loan program.  Your inquiry raises issues regarding federal preemption and application of the Most Favored Lender ("MFL") provision of the Home Owners' Loan Act ("HOLA").[1]

    In brief, we conclude that federal law does not preempt the cited Indiana law prohibiting fraudulent and deceptive loan practices.  Federal law does, however, preempt the cited Indiana laws that pertain to disclosure and loan-related charges (except for charges that constitute "interest" under the MFL provision). Moreover, under the MFL provision, the Association may elect to charge interest (including charges that constitute interest) up to the maximum amount authorized by the laws of Indiana for the state's most favored lender, notwithstanding any contrary provision in Indiana's laws or the laws of any other states where borrowers reside.

**I.   Background**

    The Association is a federal savings bank ▉▉▉▉▉▉▉ ▉▉▉▉▉▉ located in Indiana.  The Association proposes to issue ▉▉ credit cards to customers nationwide.

---

[1]    12 U.S.C.A. § 1463(g) (West Supp. 1996).

2

You indicate that the Indiana Uniform Consumer Credit Code (the "UCCC") regulates all persons making consumer loans in Indiana, including unsecured credit card loans.[2]  The UCCC addresses two areas: (1) finance charge rates and other charges;[3] and (2) disclosure requirements incorporated from the federal Truth in Lending Act (the "TILA") and Federal Reserve Board Regulation Z.[4]  You also represent that the Indiana deceptive acts and practices statute (the "DAP") regulates the activities of lenders by prohibiting specified acts and representations in connection with consumer transactions.[5]

You inquire whether the Association must comply with these three Indiana laws in connection with ████████ credit card loans issued to borrowers located in Indiana and in other states.

## II.   Discussion

A complete response to the Association's inquiry requires examination of both HOLA's MFL provision and OTS's lending regulations.

When a savings association issues credit cards, it may utilize the MFL rate authorized by section 4(g) of the HOLA.  This provision permits savings associations to charge interest on loans at the most favorable rate allowed any lender by the laws of the state in which the association is located, notwithstanding any contrary state law.  Moreover, a savings association may "export" the favorable MFL rate of the location state when making loans to borrowers who

---

[2]   See Ind. Code § 24-4.5-3-101 et seq. (1995).

[3]   Ind. Code § 24-4.5-3-508 (1995), as amended by 750 IAC 1-1-1, provides that the maximum finance charge permissible for supervised consumer loans is 36% for unpaid balances of less than $870; 21% for unpaid balances between $870 and $2,900; and 15% for unpaid loan balances in excess of $2,900.

[4]   The UCCC directs the creditor to "disclose to the debtor to whom credit is extended with respect to a consumer loan the information required by the Federal Consumer Credit Protection Act." Ind. Code § 24-4.5-3-301(2) (1995).  The UCCC defines "Federal Consumer Credit Protection Act" to mean the federal Truth in Lending Act (15 U.S.C.A. § 1601 et seq.) as amended by the Truth in Lending Simplification and Reform Act (Pub. L. 96- 221, 94 Stat. 168), and any regulations issued thereunder.  Ind. Code §§ 24-4.5-1-102(4) and 24-4.5-1-302 (1995).  Regulation Z implements TILA and is located at 12 C.F.R. Part 225 (1996).

[5]   See Ind. Code §§ 24-5-0.5-1 et seq. (1995).  For example, the statute prohibits a person who regularly engages in consumer transactions from making representations that "a specific price advantage exists as to [the] subject of the consumer transaction, if it does not and the [person] knows or should reasonably know that it does not" and from making oral or written representations that a consumer transaction involves "rights, remedies or obligations, if the representation is false and if the [person] knows or should reasonably know that the representation is false." Ind. Code § 24-5-0.5-3(6) & (8) (1995).

3

reside in other states." The practical effect of section 4(g) is to preempt state usury laws to a limited extent.

Beyond the MFL provision. the HOLA also authorizes OTS to promulgate regulations that have preemptive effect. Prior to enactment of the HOLA. "'the states had developed a hodgepodge of savings and loan laws and regulations. . . . [When enacting HOLA.] Congress hoped that [the] . . . rules [of the Federal Home Loan Bank Board and now OTS] would set an example for uniform and sound savings and loan regulation.'"[7] Consistent with this intent. courts have long recognized that federal savings associations are uniquely federalized financial institutions – even more so than national banks.[8] As the Supreme Court has recognized:

> Congress directed that. in regulating federal [savings associations].
> the [Bank Board and now OTS should] consider "the best practices
> of local mutual thrift and home financing institutions in the United
> States." which were at the time all state-chartered. By so stating.
> Congress plainly envisioned that federal savings [associations]
> would be governed by what the [Bank Board and now OTS] – not
> any particular state – deemed to be the best practices. and approved
> the . . . promulgation of regulations superseding state law. . . .[9]

Consistent with the foregoing, the OTS has authority to issue regulations preempting state laws that affect the operations of federal savings associations.

The OTS and the Bank Board have long taken the position that federal lending laws and regulations are intended to occupy the entire field of lending regulation for federal savings associations. leaving no room for state regulation.[10] For these purposes. the field of lending regulation has been defined to encompass all laws affecting lending by federal thrifts. except certain specified areas where

---

[6]    See Marquette National Bank v. First of Omaha Service Corp., 439 U.S. 299 (1978).

[7]    Conference of Federal Savings and Loan Associations v. Stein, 604 F.2d 1256 (9th Cir. 1979) (citations omitted).

[8]    People v. Coast Federal Savings and Loan Association, 98 F. Supp. 311. 319 (S.D. Calif. 1951).

[9]    Fidelity Federal Savings and Loan Association v. de la Cuesta, 458 U.S. 141, 153-154 (1982).

[10]    For a general discussion of the principles of federal preemption. see OTS Op. Chief Counsel (Oct. 11. 1991).

4

state law furthers a vital state interest and has only an incidental effect on lending operations.

The preamble to OTS's recent final rule streamlining its lending and investment regulations explains the rationale for this position:

> [I]nstead of being subject to a hodgepodge of conflicting and overlapping state lending requirements, federal thrifts [should] be free to originate loans under a single set of uniform federal laws and regulations.  This furthers both the "best practices" and safety and soundness objectives of the HOLA by enabling federal thrifts to deliver low-cost credit to the public free from undue regulatory duplication and burden.  At the same time, the interests of borrowers are protected by the elaborate network of federal borrower-protection statutes applicable to federal thrifts . . . .  In addition, in those instances where OTS has detected a gap in the federal protections provided to borrowers, the agency has promulgated regulations imposing additional consumer protection requirements on federal thrifts. [11]

Accordingly, OTS has preempted most state laws affecting lending by federal thrifts.  This position was previously reflected in the OTS regulation at 12 C.F.R. § 545.2 (1996), has been confirmed and carried forward in OTS's recent final rule updating and streamlining its lending and investment regulations, and will be codified in OTS regulations at 12 C.F.R. § 560.2. [12]

The preamble to OTS's recent final rule describes the analytic framework to be used in determining whether a particular state law that affects lending is, or is not, preempted by federal law.  The preamble states:

> When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed [among the illustrative examples of preempted state laws] in paragraph (b) [of § 560.2].  If so, the analysis will end there; the law is preempted.  If the law is not covered by paragraph (b), the next

---

[11]   61 Fed. Reg. 50951 at 50965-50966 (Sept. 30, 1996).

[12]   See 61 Fed. Reg. at 50972.  The preamble to this regulation, which became effective on October 30, 1996, contains an extensive discussion of the scope of, and the legal basis for, the OTS authority to preempt by regulation.  See 61 Fed. Reg. at 50965-67.  A copy of the preamble is enclosed for your reference.

5

question is whether the law affects lending. If it does. then. in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of [the types of state laws not preempted. as described in § 560.2(c)]. For these purposes. paragraph (c) is intended to be interpreted narrowly.[13]

We have examined the three cited Indiana laws under this analytic framework.

## A. Interest Rates and Related Charges

The new OTS lending regulation specifically addresses your inquiry regarding federal preemption of state laws regulating interest rates and related charges. The illustrative list of preempted state laws at § 560.2(b) indicates. in subparagraph (12), that state interest rate ceilings are preempted to the extent provided in the MFL provision of the HOLA. Thus. when the Association issues a credit card under the MFL provision. it may "charge interest at the maximum rate permitted to any state-chartered or licensed lending institution by the law of [Indiana]," notwithstanding any contrary provisions in Indiana law or the law of the states where borrowers reside.[14] The OTS MFL regulation defines interest as follows:

> The term 'interest' . . . includes any payment compensating a creditor or prospective creditor for an extension of credit . . . . It includes, among other things, the following fees connected with credit extension or availability: numerical periodic interest rates. late fees. not sufficient funds (NSF) fees. overlimit fees. annual fees. cash advance fees. and membership fees. It does not ordinarily include appraisal fees. premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit. finders' fees, fees for document preparation or notarization, or fees incurred to obtain credit reports.[15]

---

[13]    61 Fed. Reg. at 50966.

[14]    The OTS recently conformed the text of its regulation implementing HOLA § 4(g) to the regulation implementing a similar statutory MFL provision for national banks. See 61 Fed. Reg. at 50981 (to be codified at 12 C.F.R. § 560.110). The Office of the Comptroller of the Currency's ("OCC") rule implementing 12 U.S.C.A. § 85 (West 1989) is found at 61 Fed. Reg. 4849. 4869 (Feb. 9, 1996) (to be codified at 12 C.F.R. § 7.4001).

[15]    12 C.F.R. § 560.110(a).

6

Loan-related fees not covered by the definition of interest under the MFL provision of the HOLA are governed by subparagraph (5) of § 560.2(b).[16] This provision preempts state laws regulating "loan-related fees. including without limitation. initial charges. late charges. prepayment penalties. servicing fees. and overlimit fees." but does not apply to numerical interest rates.  Subparagraph (5) reflects OTS's determination that federal thrifts should be free to contract with customers for fees that are driven by the market for financial services. rather than government regulation. provided adequate loan-fee disclosure is given to consumers (as federal law mandates).

We note that at least one type of fee (late fees) listed as preempted in subparagraph (5) also falls within the scope of the term "interest" under the OTS MFL regulation.  Because the statutory MFL provision is a specific expression of Congressional intent. any overlap between that provision and subparagraph (5) must be resolved in favor of the MFL provision whenever a lender originates a loan under the MFL provision.  What this means for the Association is as follows.

Indiana's UCCC sets a maximum finance charge for supervised consumer loans that varies based on the amount of the unpaid balance of the loan.  Under the UCCC, the finance charge is broadly defined to include "all charges payable directly or indirectly to the lender as an incident to the extension of credit."[17] This language is broad enough to encompass all fees and charges that constitute "interest" under the MFL provision.  Thus, when issuing a credit card loan under the MFL provision. the Association must abide by any limits in the Indiana UCCC governing not only the numerical interest rate. but also late fees, NSF fees. overlimit fees. annual fees. cash advance fees. and membership fees.

The Indiana UCCC also purports to apply its usury limits to any charges imposed by the Association "for any guarantee or insurance protecting the lender against the debtor's default or other credit loss; and charges incurred for investigating the collateral or credit-worthiness of the debtor."[18] These charges. however, are expressly excluded from the definition of "interest" under OTS's

---

[16]     See 12 C.F.R. § 560.110(b) ("Except as provided in this paragraph. the applicability of state law to Federal savings associations shall be determined in accordance with § 560.2 of this part.")

[17]     Ind. Code § 24–4.3-109(1) (1995).

[18]     Id.

MFL regulation.[19] As provided in the MFL regulation at § 560.110(b), the status of state laws that are not encompassed by the MFL regulation are governed by the general principles of preemption set forth in § 560.2. As noted above, § 560.2(b)(5) preempts state laws that attempt to "impose requirements regarding . . . loan-related fees." This language encompasses fees charged for appraisals required for loan origination and premiums charged for credit insurance.

Thus, when issuing credit cards, the Association will be required to limit all fees and charges that constitute "interest" (as defined in § 560.110(a)) to the maximum rate authorized for Indiana's most favored lender. No other state's laws will apply to these fees and charges, even if the Association's borrowers reside in another state. All state laws that purport to address loan-related fees that are not included within the MFL definition of interest are preempted by federal law.

## B. Disclosure Requirements

The new OTS lending regulation also addresses federal preemption of disclosure requirements. Section 560.2(b)(9) provides that state laws imposing lending disclosure and advertising requirements are preempted. State laws within the purview of § 560.2(b)(9) include those that require specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents. The provision of the Indiana UCCC requiring specific lending disclosures by the Association is preempted by this federal regulation.[20] Instead, the Association is required to comply with the elaborate federal network of disclosure laws, including TILA and Regulation Z.[21]

This conclusion is not altered by the fact that the MFL provision will apply to the Association's credit card program. Although institutions utilizing the MFL

---

[19]     12 C.F.R. § 560.110(a) (Interest "does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, . . . or fees incurred to obtain credit reports.")

[20]     This conclusion is consistent with the agency's longstanding position that state disclosure laws are preempted. See e.g., OTS Op. Dep. Chief Counsel (Oct. 18, 1994) (state law requiring a savings association to provide copies of credit reports held by the savings association); OTS Op. Chief Counsel (Jan. 3, 1991) (state law requiring disclosure of information on escrow accounts for mortgages); FHLBB Op. by Gen. Counsel (Apr. 28, 1987) (state regulations purporting to regulate lending disclosure); and FHLBB Op. by Gen. Counsel (Nov. 12, 1985) (state truth in lending laws).

[21]     Because the Indiana law merely incorporates by reference already-applicable federal requirements under TILA and Regulation Z, we recognize that the practical effect of preemption, in this instance, would be negligible.

8

provision must comply with any provisions of state law that are "material to the determination of the permitted interest rate."[22]  Indiana's disclosure laws are not material to this determination.

In the past, state laws have been deemed to be material to the determination of the interest rate in only two instances.  First, whenever a state authorizes an interest rate for a particular category of loan, the provisions of law defining the fundamental characteristics of that category of loan must be observed.[23]  Second, state laws defining how interest is to be computed must also be observed.[24]

Indiana's UCCC disclosure law, however, neither defines the fundamental characteristics of the category of loans covered by the usury rates in question nor affects the manner of computing the interest rate.  Accordingly, the UCCC disclosure law is not material to the interest rate and is not encompassed by the MFL provision.[25]

Thus, general principles of federal preemption determine what disclosure requirements apply to loans made by the Association under the MFL provision.[26]  As indicated above, § 560.2(b)(9) preempts the Indiana disclosure law.

You have also asked whether federal law would preempt a cited Ohio disclosure law which requires lenders to provide written statements notifying borrowers of their rights under state anti-discrimination statutes.[27]  Specifically, this statute requires that credit application forms (or where there is a multi-state

---

[22]    12 C.F.R. § 560.110(b).

[23]    See OCC Interpretive Letter No. 354 [1985-87 Transfer Binder] Fed. Bank L. Rep. (CCH) ¶ 85,524.  The OTS and the FHLBB have long looked to OCC precedent interpreting the national bank MFL provision for guidance in interpreting section 4(g) and the OTS implementing regulation.  See e.g. OTS Op. Chief Counsel, Dec. 24, 1992, pp. 3-4.

[24]    Id.

[25]    Accord OCC Interpretive Letter No. 178, [1981-82 Transfer Binder] Fed. Bank. L. Rep. (CCH) ¶ 85,259; OCC Interpretive Letter No. 333, [1985-87 Transfer Binder] Fed. Bank. L. Rep. (CCH) ¶ 85,503.  This determination is consistent with the preamble to the OTS regulation which states that a disclosure provision will be material to the determination of the interest rate only in "rare instances."  61 Fed. Reg. 50968.  This position reflects a change in the OTS's interpretation of the MFL statute.  Under the prior OTS regulation at 12 C.F.R. § 571.22 (1996), thrifts were required to comply with consumer protection laws, including disclosure provisions, of the state in which they were located when making loans under the MFL provision.  Id.  Under the new regulation, consumer protection laws no longer automatically apply.

[26]    12 C.F.R. § 560.110(b).

[27]    Ohio Rev. Code Ann. § 4112.021(g) (Anderson 1996).

9

distribution. notices of acceptance or rejection of the application) include the following statement: "Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers." As already discussed above. the OTS regulation at § 560.2(b)(9) preempts state laws imposing disclosure requirements. including the cited Ohio disclosure law.[28] Accordingly, the Association need not comply with this disclosure provision.

## C. Deceptive Acts and Practices Statute

Your final preemption inquiry involves Indiana's DAP law. State laws prohibiting deceptive acts and practices in the course of commerce are not included in the illustrative list of preempted laws in § 560.2(b). Thus. a more extensive preemption analysis of Indiana's DAP statute is required. The DAP statute prohibits specified acts and representations in all consumer transactions without regard to whether the transaction involves an extension of credit.[29] Although not directly aimed at lenders. this law affects lending to the extent that it prohibits misleading statements and practices in loan transactions by a federal savings association. Accordingly, under the analysis described above. a presumption arises that the DAP statute would be preempted in connection with loans made by the Association.

The OTS has indicated, however. that it does not intend to preempt state laws that establish the basic norms that undergird commercial transactions.[30] Accordingly, in § 560.2(c), the OTS has identified certain categories of state law that are not preempted.[31] A state law that falls within the specified categories will not be preempted if the law only incidentally affects the lending operations of federal savings associations. or is otherwise consistent with the objectives that underlie OTS's preemption position. as set forth in paragraph (a) of § 560.2.[32] Paragraph (a) indicates that the OTS's objectives are to facilitate the safe and sound operation of federal savings associations. to enable federal associations to

---

[28]    We note that the Ohio law is largely duplicative of the disclosure requirement contained in Regulation B which implements the Equal Credit Opportunity Act. See 12 C.F.R. § 202.9(a)(2) (1996). This regulation requires lenders to provide a notice setting forth the protections contained in section 701(a) of the Act "whenever an adverse action is taken with regard to a credit application."

[29]    See Ind. Code § 24-5-0.5-2(1) (1995) (definition of consumer transaction).

[30]    61 Fed. Reg. at 50966.

[31]    12 C.F.R. § 560.2(c)(1) through (5). These categories include: contract and commercial law, real property law, homestead laws. tort law and criminal law.

[32]    12 C.F.R. § 560.2(c).

10

conduct their operations in accordance with best practices of thrift institutions in the United States, and to further other purposes of the HOLA.

The Indiana DAP falls within the category of traditional "contract and commercial" law under § 560.2(c)(1). While the DAP may affect lending relationships, the impact on lending appears to be only incidental to the primary purpose of the statute -- the regulation of the ethical practices of all businesses engaged in commerce in Indiana. There is no indication that the law is aimed at any state objective in conflict with the safe and sound regulation of federal savings associations, the best practices of thrift institutions in the United States, or any other federal objective identified in § 560.2(a). In fact, because federal thrifts are presumed to interact with their borrowers in a truthful manner, Indiana's general prohibition on deception should have no measurable impact on their lending operations. Accordingly, we conclude that the Indiana DAP is not preempted by federal law.[33]

You have asked whether the Association may "export" the Indiana DAP prohibitions when issuing credit cards to borrowers located in other states under the MFL provision. In other words, may the Association comply with Indiana's DAP in lieu of the deceptive practices laws of any other state?

As noted above, only state laws that set the maximum amount of interest or that are material to the determination of interest are covered by the MFL provision. Indiana's DAP does not establish the maximum interest permitted under Indiana law, does not prescribe unique characteristics of a specified class of loans permitted under Indiana law, and does not address the manner in which interest is computed. Accordingly, the DAP is not covered by the MFL provision.

Thus, general principles of federal preemption govern. As indicated above, nothing in federal law preempts general deceptive practices statutes. The Association is required to comply with the Indiana DAP and those deceptive practices statutes of other states that are worded in a manner to apply to the Association's loans. The applicability of conflicting state requirements should be resolved under traditional conflicts of laws principles and may turn on the facts of the specific transaction. Under some circumstances, the deceptive practices laws of more than one state may apply to the same transaction.

---

[33]     This conclusion is consistent with relevant case law.  See Morse v. Mutual Federal Savings and Loan Association of Whittingham, 536 F. Supp. 1271 (D. Mass. 1982) (federal savings associations are subject to a general Massachusetts statute proscribing unfair and deceptive trade practices).

11

In reaching the foregoing conclusions, we have relied upon the representations made in the materials you submitted and in subsequent discussions. Our conclusions depend upon the accuracy and completeness of those representations. Any material difference in facts or circumstances from those described herein could result in different conclusions.

If you have any questions regarding this matter, please feel free to contact Karen Osterloh, Counsel (Banking and Finance), (202) 906-6639.

Very truly yours,

Carolyn J. Buck
Chief Counsel

Enclosure

cc:    All Regional Directors
       All Regional Counsel